UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

In re: BAYCOL PRODUCTS LITIGATION MDL No. 1431 (MJD/JGL)

This Document Relates to:

| | |
|---|---|
| Abrams v. Bayer Corp., et al., | 02-0135 |
| Benzuly v. Bayer Corp., et al., | 02-3580 |
| Hurt v. Bayer Corp., et al., | 02-0165 |
| Jensen v. Bayer Corp., et al., | 02-3581 |
| Jones v. Bayer Corp., et al., | 02-0198 |
| Knearem v. Bayer A.G., et al., | 02-0999 |
| Lester v. Bayer Corp., et al., | 02-0156 |
| Martinez v. Bayer Corp., et al., | 02-0877 |
| Rizzo v. Bayer Corp., et al., | 02-0150 |

Background

The cases identified above are putative class actions, were each filed in state court, and include a claim for medical monitoring. With respect to each case, Defendants removed, in part, on the basis that a claim for medical monitoring exceeds the amount in controversy. Motions to remand were thereafter filed in the above-referenced cases. The Court granted Defendants' request for consolidated briefing on this issue.

The cases at issue here include a claim for medical monitoring. The typical medical monitoring claim seeks medical screening for adverse health effects that are so far undiagnosed and treatment for any adverse health effects detected. See eg., Abrams, Comp. ¶ 47 ("Plaintiff requests a medical monitoring fund be established to pay for costs of regular medical examinations to detect adverse reactions and the early onset of



FEB 26 2003
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

conditions associated with Baycol"); Martinez Comp. ¶ 18(3)(plaintiffs seek to establish a fund "to provide medical monitoring, evaluation and assessment of the plaintiffs and all class members for their lifetimes."); Benzuly, Comp. Prayer for Relief (C)("costs and expenses in connection with any medical testing, monitoring, diagnosis or treatment related to the taking of Baycol"); Rizzo, (same); Jensen (same); Knearem (same); Lester (same). In Hurt, the request for medical monitoring is not as specific. See Hurt Comp. ¶ 2(b)("damages for medically indicated medical monitoring of the Class to insure prompt treatment of injuries caused by Baycol"). In the Jones action, additional relief is sought. Jones Comp. ¶ 43(c)("[a]n Order for a screening and medical monitoring program for the plaintiff and all members of the class for adverse health effects arising from the ingestion of Baycol as well as provide medical research for patient and doctor education and a medical legal registry.")

Plaintiffs' argue that, for purposes of determining the amount in controversy, the Court must consider the value of a medical monitoring program to each plaintiff individually. By this measure, the Plaintiffs argue that the value of the requested medical monitoring relief to each plaintiff does not exceed $75,000. In fact, in many of the actions at issue here contain a specific allegation that each plaintiff has not incurred damages in excess of $75,000, nor is any plaintiff seeking damages in an amount exceeding $75,000. See, Abrams Comp. ¶ 6; Benzuly Comp. ¶ 6; Jensen Comp. ¶ 6; Knearem Comp. ¶ 7; Lester Comp. ¶ 6; Rizzo Comp. ¶ 6. Accordingly, the Plaintiffs argue that remand is warranted as the amount in controversy is not met.

Standard for Remand

Remand to state court is proper if the district court lacks subject matter jurisdiction over the asserted claims. 28 U.S.C. § 1447(c). In reviewing a motion to remand, the court must resolve all doubts in favor of a remand to state court, and the party opposing remand has the burden of establishing federal jurisdiction by a preponderance of the evidence. In re Business Men's Assurance Co. of America, 992 F.2d 181, 183 (8th Cir. 1983)(citing Steel Valley Auth. v. Union Switch & Signal Div., 809 F.2d 1006, 1010 (3rd Cir. 1987) cert. dismissed 484 U.S. 1021 (1988)).

1. Appropriate Measure of the Medical Monitoring Claim

In Snyder v. Harris, 394 U.S. 332, 335-336 (1969), the Supreme Court reaffirmed "the well-established rule that each of several plaintiffs asserting separate and distinct claims must satisfy the jurisdictional-amount requirement if his claim is to survive a motion to dismiss." Gilman v. BHC Securities, Inc., 104 F.3d 1418, 1422 (2nd Cir. 1997)(quoting Zahn v. International Paper Co., 414 U.S. 291 (1973)). "An equally well-established principle is that 'when several plaintiffs unite to enforce a single title or right, in which they have a common and undivided interest, it is enough if their interests collectively equal the jurisdictional amount.'" Gilman, at 1422 (quoting Troy Bank of Troy, Indiana v. G.A. Whitehead & Co., 222 U.S. 39, 40-41 (1911)). This exception to the non-aggregation rule is referred to as the common fund exception.

The court in Gilman listed a number of examples where the common fund exception was applied. Id. at 1423. One such example involved "an action by several members of the same family to secure family social services in which they shared a

'common and undivided" interest., aggregation of claims was allowed in a wrongful death action under a statute which created single liability on the part of the defendant and permitting but one action for the sole and exclusive benefit of all surviving beneficiaries. Id. The common fund was also applied in an action by two assignees of two promissory notes to enforce their common and undivided interest in a vendor's lien. Id. Another example where the common fund was applied was an action by an Indian tribe to quiet title to a single tract of land. The Gilman court then noted:

> [T]he 'paradigm cases' allowing aggregation of claims 'are those which involve a single indivisible res, such as an estate, a piece of property (the classic example), or an insurance policy. These are matters that cannot be adjudicated without implicating the rights of everyone involved with the res.'

Id. (quoting Bishop v. General Motors Corp., 925 F. Supp. 294, 298 (D.N.J. 1996).

Bayer argues that the medical monitoring claims asserted fall within the common fund exception to non-aggregation. In support, Bayer has submitted a declaration from Dennis Connolly. Mr. Connolly is the managing director of Marsh, U.S.A., Inc., an insurance broker and provider of health and employment benefits administration. Connolly Decl. ¶ 2. Mr. Connolly states that he reviewed the complaints at issue here, and found that in each case, the complaints place no boundaries on the scope or duration of the requested medical monitoring. Id. ¶ 4. He further noted that based on his experience, "a medical monitoring program geared to handle such inherent uncertainties in magnitude, scope and duration would, as plaintiff requests, require a guaranteed source of funds, typically in the form of a trust fund, before any benefits could be paid." Id. He noted that this type of fund is different from a settlement fund

that typically will provide for the payment of individually cognizable, calculable and correctable damages claims, that last only temporarily. Id. The costs associated with the establishment of a medical monitoring program would include development of the monitoring protocol, tracking programs, scientific research and the costs of administering the program. Id. ¶¶ 4, 5. He stated that the base cost for the implementation of such a program that would potentially involve thousands to millions of claimants would be in excess of $75,000. Id. ¶ 5.

Courts that have addressed whether requested medical monitoring on behalf of a putative class meets the amount in controversy requirement have determinated the medical monitoring is injunctive in nature. See, Jackson v. Johnson & Johnson, Inc. et al., 2001 U.S. Dist. LEXIS 22329 (W.D. Tenn. 2001); In re: Rezulin Products Liability Litigation, 168 F. Supp. 2d 136, 152 (S.D.N.Y. 2001); In re: Diet Drugs, 1999 WL 673066 (E.D. Pa. 1999); Katz v. Warner-Lambert Company, 9 F. Supp.2d 363 (S.D.N.Y. 1998); Gibbs v. DuPont De Nemours & Co., Inc., 876 F. Supp. 475, 479 (W.D.N.Y. 1995). As such, the courts recognized that the amount in controversy is measured by the "value of the object of the litigation." See eg., Katz, 9 F. Supp. 2d at 363 (quoting Hunt v. Washington State Apple Advertising Comm., 432 U.S. 333 (1977)). The value must be determined from the viewpoint of the plaintiff rather than the defendant. Burns v. Massachusetts Mutual Life Ins. Co., 820 F.2d 246, 248 (8th Cir. 1987).

Each of the opinions listed above have uniformly found that, given the unique nature of a medical monitoring claim, the value of medical monitoring from the plaintiff's viewpoint is nonetheless determined by reference to the cost to the defendant.

For example, in the Rezulin decision, the court noted that:

> one method of measuring the value of the such a fund to the plaintiff is by reference to the cost to the defendant. This method does not shift the viewpoint from which value is determined or to quantify value that is otherwise speculative or conjectural; rather, it acknowledges the reality that a medical monitoring fund must be funded fully for each individual to receive whatever benefits might result.

168 F. Supp. 2d at 152 (relying in part on Katz, 9 F. Supp.2d at 365). In Katz, the medical monitoring claim included a request for medical research. The court recognized that a plaintiff seeking relief in the form of medical research "would have either to fund such research herself, or prevail in [the] lawsuit." Katz, 9 F. Supp.2d at 365. "[T]he full amount of research, rather than some fraction of it, must be funded to benefit any single member of the contemplated class. Indeed, plaintiff demands that the full amount of research be undertaken regardless of the number of members of the class because each and every member is entitled, in plaintiff's view, to the protection against Rezulin's hazards that only fully funded future research can hope to achieve." Id. See also, Diet Drugs, 1999 WL 673066 at *7 (adopting reasoning in Katz); Gibbs 876 F. Supp. at 479 (finding plaintiffs' request for medical monitoring injunctive relief in the form of a common, court-supervised fund the value of which exceeded amount in controversy).

As the courts have found in the cases cited above, this Court similarly finds that a claim for medical monitoring presents a unique claim that is injunctive in nature. The Court also finds that Defendants have presented competent evidence that, if Plaintiffs prevail on this claim, the only way to administer the requested relief is through the creation of a program, such as one described in the Connelly Declaration. The cost of such a medical monitoring program, even from each individual plaintiffs' viewpoint,

must be valued by reference to the cost to defendant, as a medical monitoring fund would have to be fully funded. As Plaintiffs have not presented the Court any evidence refuting the Connolly Declaration, Bayer has met its burden of establishing by a preponderance of the evidence that the amount in controversy is met. See, Rezulin, 168 F. Supp.2d at 153 (similarly relying on Connolly Declaration).

2. Benzuly - Service of Process on Bayer AG

The Benzuly Plaintiffs argue that remand of their case is nonetheless proper, as Bayer AG did not join in Bayer Corporation's removal petition. Bayer responds that Bayer AG did not need to join in the removal petition, because at the time of removal, Bayer AG had not been properly served. Bayer argues that as Bayer AG is a foreign corporation, plaintiffs had to comply with the provisions of the Hague Convention to effect proper service.

The law is clear that the Hague Convention applies in "all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad." Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 699 (1988). In Volkswagenwerk, the Supreme Court held that "[i]f the internal law of the forum state defines the applicable method of serving process as requiring the transmittal of documents abroad, then the Hague Service Convention applies." Id. at 700. The Court further held that as the applicable state law provided that a foreign corporation could be served through its domestic wholly-owned subsidiary without sending documents to Germany, the Hague Convention did not apply. Id. at 707-708.

In the Benzuly case, Plaintiffs assert that service was effected pursuant to § 5.30 of the Illinois Business Corporation Act, 805 ILCS 5/101 et seq. This statute provides:

> If any foreign corporation transacts business in this State without having obtained authority to transact business, it shall be deemed that such corporation has designated and appointed the Secretary of State as an agent for process upon whom any notice, process or demand may be served. Service on the Secretary of State shall be made in the manner set forth in subsection (c) of Section 5.25 of this Act.

Section 5.25(c) provides that service upon the Secretary of State shall include transmittal, by the person instituting the action, suit or proceeding of notice of the service on the Secretary of State and a copy of the process, notice or demand and accompanying papers to the corporation being served by registered or certified mail.

While Plaintiffs argue that service is effected upon service on the Secretary of State, the statute clearly provides that in addition to serving a copy on the Secretary of State, the plaintiff must also transmit a copy of the summons and complaint by mail to the corporation being served. Accordingly, the applicable state law provides for the transmittal of documents abroad, implicating the Hague Convention. See, Melia v. Les Grands Chais de France, 135 F.R.D. 28 (D. Rhode Island 1991)(noting that where state statute allows for substituted service upon the Secretary of State, but also requires plaintiff to mail notice directly to the defendant implicates Hague Convention); Wasden v. Yamaha Motor Co. Ltd., 131 F.R.D. 206 (M.D.Fla. 1990)(where state statute provided for service upon the Secretary of State, and that Secretary should forward copy to person to be served implicates Hague Convention).

To effect service upon a German corporation pursuant to the Hague Convention, the summons and complaint must be sent to the appropriate central authority. There is no evidence in the record to show that a copy of the summons and complaint was sent to the appropriate central authority. As Bayer AG was not properly served at the time of removal, its consent to remove was not needed.

3. Failure to Comply with Local Rule 81.2

Both Plaintiffs in the Benzuly and Rizzo cases argue that remand of their respective actions is appropriate because Bayer failed to comply with Local Rule 81.2 for the Northern District of Illinois. Although the Local Rules for the Northern District of Illinois were applicable at the time of removal, this Court, as the transferee court pursuant to 28 U.S.C. § 1407, now has jurisdiction of these cases. As such, this Court applies the Rules of this District. See, Van Dusen v. Barrack, 376 U.S. 612, 639 n. 40, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964)(although transferee court must apply substantive law of transferor, "the transferee District Court may apply its own rules governing the conduct and dispatch of cases in its court."). As Bayer removed both the Benzuly and Rizzo actions within 30 days of service of the Complaints, the requirements of 28 U.S.C. § 1446(b) have been met. The Local Rules of this District do not require more.[1]

4. Untimely removal pursuant to § 1446

The Jensen complaint was filed and served on Bayer in August 2001. Bayer filed

---

[1]Even if the Local Rules of the Northern District of Illinois governed, it is not clear that remand would be warranted. See eg. Marketing Frontiers, Inc. v. SL Waber, Inc., 1999 WL 988732 (N.D. Ill. 1999)(where defendant subjectively knew that amount in controversy was greater than $75,000 at time the complaint was filed, the notice of removal must be filed within 30 days of service of the complaint).

a notice of removal on March 8, 2002. In the petition for removal, Bayer asserted that only upon receiving plaintiff's responses to Bayer's interrogatories did it become aware that the amount in controversy exceeded $75,000.

The Court first notes that the complaint in Jensen is virtually identical to the Complaint filed in Benzuly. In response to the Benzuly and Rizzo arguments that Bayer did not comply with 81.2, Bayer argued that Rule 81.2 did not apply because Bayer had subjective knowledge, independent of the express allegations in the complaint, that the amount in controversy was met. (Defendant's Consolidated Memorandum in Opposition to Motions for Remand, p. 36). Now, in response to the Jensen motion to remand, Bayer argues that it did not have knowledge that the amount in controversy exceeded $75,000 until receiving plaintiff's response to interrogatories. Bayer cannot have it both ways. Because Bayer had independent knowledge that the amount in controversy exceeded $75,000, the notice of removal is untimely and remand warranted.

5. Fraudulent Joinder - Jones

Jones v. Bayer Corp et at. was commenced in West Virginia state court on August 27, 2001 as a putative class action seeking to represent all persons who have ingested Baycol. Amended Class Action Complaint, ¶ 1. The Complaint asserts causes of action against Bayer Corp, as well as Paul Stakias as sole proprietor of Pen-Way Pharmacy and Dr. Gary R. Hanson. The Jones plaintiffs argue that as Pen-Way Pharmacy and Dr. Hanson are residents of West Virginia, removal by Bayer was inappropriate as diversity amongst the parties was lacking. Bayer argues that both Pen-Way Pharmacy and Dr. Hanson were fraudulently joined.

In his answer to the Complaint, Dr. Hanson stated he was not a resident of West Virginia. Plaintiffs nonetheless argue that removal was not proper, as Dr. Hanson did not consent to removal. At the time the removal petition was filed, however, Dr. Hanson's Answer had not been filed thus Bayer was not put on notice that Dr. Hanson's consent was needed. Under these circumstances, failure to obtain Dr. Hanson's consent does not affect the propriety of removal.

Fraudulently joined defendants will not defeat diversity jurisdiction. Ritchey v. Upjohn Drug Company, 139 F.3d 1313, 1318 (9th Cir. 1998). "Fraudulent joinder exists if, on the face of plaintiff's state court pleadings, no cause of action lies against the resident defendant." Anderson v. Home Insurance Company, 724 F.2d 82, 84 (8th Cir. 1993). Dismissal of fraudulently joined non-diverse defendants is appropriate. Wiles v. Capitol Indemnity Corp., 280 F.3d 868, 871 (8th Cir. 2002).

In the Complaint, Plaintiffs allege that some class members purchased their prescription for Baycol from Pen-Way Pharmacy, and that the pharmacy is strictly liable under West Virginia product liability law. Id. ¶ 77. In addition, Plaintiffs allege that Pen-Way Pharmacy is a merchant and is liable for breach of implied and express warranties. Id. ¶ 78.

Bayer argues that Plaintiffs cannot maintain an action against Pen-Way Pharmacy under a strict liability, failure to warn theory or under a theory of breach of warranties. In support, Bayer cites to W. Va. Code § 30-5-12, which states:

> All persons, whether licensed pharmacists or not, shall be responsible for the quality of all drugs, chemicals and medicines they may sell or dispense, with the exception of those sold in or dispensed unchanged from the original retail

> package of the manufacturer, in which even the manufacturer shall be responsible.

It is Bayer's position that as Pen-Way sold or dispensed Baycol unchanged from the original retail package of the manufacturer, and there are no allegations to the contrary, Pen-Way cannot be held strictly liable under a theory of failure to warn. Bayer further asserts that this interpretation of the statute has been adopted by the West Virginia Board of Pharmacy in an Opinion Letter dated August 23, 2000. Defendant's Ex. G. This letter states:

> [I]f a pharmacist only counts out or measures the correct prescribed drug and the prescribed dosage from the original retail package received in bulk, stock bottles from the manufacturer and transfers that dosage unchanged to the pill bottle or the container given to the consumer, then they are not liable for the quality of such drugs; the manufacturer is. The pharmacy can only assume that any FDA-approved prescription drugs received from the manufacturer are of good quality and if dispensed as received would achieve its therapeutic purpose.

Only one court to date has interpreted § 30-5-12. In In re: Rezulin Products Liability Litigation, 133 F. Supp.2d 272 (S.D.N.Y. 2001), the court held that a West Virginia plaintiff's claims of negligence, wilfulness, wantonness and breach of express and implied warranties against the defendant pharmacy did not state a cause of action where the plaintiff did not allege that the Rezulin was removed from its original packaging, pursuant to W. Va. Code § 30-5-12. Id. at 294.

The Plaintiffs argue that § 30-5-12 is concerned only with the quality of the drugs sold. Thus, the statute only precludes a plaintiff from bringing a design defect or structural defect claim against a defendant pharmacy where such defendant pharmacy sells or dispenses the drug in the original retail packaging of the manufacturer. West

Virginia recognizes three theories of strict liability, which are not necessarily mutually exclusive: structural, design and use defects(which is the failure to warn). See, Morningstar v. Black and Decker Manufacturing Co., 253 S.E.2d 666, 682 (W.Va. 1979). Plaintiffs argue that structural and design defects clearly concern the "quality" of the drug product, whereas failure to warn concerns the quality of the labeling and warnings. Therefore the statute should be interpreted as precluding structural and design defects claims against a defendant pharmacy for a drug sold or dispensed in the original package of the manufacturer. Plaintiffs ask this Court not to place any reliance on the Rezulin decision, as that case did not involve a strict liability, failure to warn claim. Plaintiffs further argue that as no court in West Virginia has decided this issue, the matter should be remanded to allow the state court to address the issue.

First, the Court notes that the Complaint includes the allegation that the pharmacy is "strictly liable under West Virginia product liability law . . ." Complaint, ¶ 77. There is no mention of a failure to warn claim as against the defendant pharmacy. Thus, to the extent that Plaintiffs allege a structural or design defect claim against Pen-Way, there does not appear to be a dispute that § 30-5-12 precludes such claims.

Second, even if the Court construes the Complaint as alleging a failure to warn claim against Pen-Way, the Court finds that such claim is also precluded by § 30-5-12. If the legislature intended to preclude only two of the three strict liability theories recognized by the West Virginia courts through the passage of § 30-5-12, it would have explicitly included those theories in the statutory language. However, the statutory language does not reference any particular theory of liability. In addition, as noted in

the Rezulin decision, "[a]lmost every state confronted with the question has declined to impose on pharmacists a duty to warn of instrinsic dangers of prescription drugs". Rezulin, 133 F. Supp. 2d at 289. (listing cases.) Given the legal landscape concerning this issue throughout the United States, together with the enactment of § 30-5-12, it is thus unlikely that West Virginia's highest court would recognize a cause of action for failure to warn against a pharmacist. Accordingly, the Court finds that for purposes of determining subject matter jurisdiction, Pen-Way Pharmacy has been fraudulently joined.

6. Fraudulent Joinder - Martinez

The Martinez action is a putative class action in which the named plaintiffs seek to represent a class that is defined as Oklahoma residents that have used Baycol, but have not yet been diagnosed with injury. Petition ¶ 1. In addition to a claim for medical monitoring, the named plaintiffs have asserted a cause of action against three medical doctors, all residents of Oklahoma, that have prescribed Baycol. Plaintiffs allege "Defendant medical doctors, as joint tortfeasors with Bayer AG and The Bayer Corporation, negligently failed to warn plaintiffs of the unreasonable risk posed by cerivastatin." Id. ¶ 18. In the prayer for relief, the Plaintiffs ask that participation in this action not interfere with a class members' right to bring a separate action for any Baycol related injury. Id. ¶ 4.

In Oklahoma, the elements of a cause of action for medical malpractice, lack of informed consent are: 1) defendant physician failed to inform the plaintiff adequately of a material risk before securing consent to the proposed treatment; 2) if plaintiff had been

informed of the risk, plaintiff would not have consented to the treatment; and 3) the adverse consequences that were not made known did in fact occur and plaintiff was injured as a result of submitting to the treatment. Scott v. Bradford, 606 P.2d 554, 559 (Okla. 1980). As the class in this action specifically excludes those with injury, and expressly reserves the right to bring a separate cause of action once injury has been diagnosed, the Court finds that the named plaintiffs have failed to state a cause of action against the defendant physicians. Accordingly, their joinder is considered fraudulent for purposes of determining diversity jurisdiction. As the remaining defendants in this action are diverse from the named plaintiffs, this Court has subject matter jurisdiction over this matter.

IT IS HEREBY ORDERED that:

1. The motions for remand filed in the Abrams, Benzuly, Hurt, Knearem, Lester, Martinez, Jones and Rizzo actions are DENIED.

2. The motion for remand filed in the Jensen action is GRANTED. Jensen v. Bayer Corp. et al., Civ. No. 02-3581 is remanded to the Circuit Court of Cook County, Illinois, Chancery Division.

Date: Feb. 25, 2003

Michael J. Davis
Michael J. Davis
United States District Court